Good morning. May it please the court, I'm Peter Camille and I represent Richard Ortiz, the appellant in the case. It's my hope to talk this morning about two issues concerning recorded conversations that were introduced during the course of Mr. Ortiz's trial, the first being the foundation for the admissibility of wiretap calls. The prison calls, there were two prison calls that were introduced during the course of the trial. The calls were Mr. Ortiz calling and speaking to a Ms. Fuentes and the government sought to introduce these calls but Ms. Fuentes was not charged and she was not called as a witness and the defense timely objected. After argument, Judge Lasnik found those calls admissible for two reasons. First, he agreed with the government that they could be introduced to show the context of Mr. Ortiz's responses and second, although he never cited the co-conspirator statement rule 801 D2E, he said that he found based on the content of the calls that she was an unindicted co-conspirator. And so the calls were admitted and the government has argued that they were never offered for their truth. Now, starting with the judge's ruling that they were admissible to show context, the problem with that is that in fact these calls were offered for the truth of what Ms. Fuentes was saying. I know the court recalls that in these conversations, it was Ms. Fuentes who made most of the incriminating remarks about how people are stepping all over us, we need you to bring us back up, we need you to make us some money, with Mr. Ortiz saying I'll do it and then at one point saying I'm the best you ever had. But she was making most of the incriminating remarks and although the government argues these weren't offered for their truth, when you look at their closing argument, that's exactly what they argued. Well, is there some reason why we can't look at the record and conclude that they are admissible under 801 D2E? I mean, we have the fact that she was the live-in girlfriend of one of the major distributors in the organization, that she was present when the takedown occurred, she was interviewed by the police. The evidence before the jury suggested that she made this call on behalf of the organization to recruit your client to get back to work as soon as he got out of custody. Why wouldn't that be admissible under 801 D2E? Well, I would argue that there wasn't sufficient independent evidence, independent of the content of the calls themselves. Okay, but you would agree that if we conclude that is sufficient, then under 801 D2E, they do come in as co-conspirator statements made in furtherance of... If there was sufficient evidence, but the fact of the matter is, she was never seen during any of the drug activity. Yes, she lived with somebody who was involved, and she was with him when he was arrested, but there were no informants that testified, but none that said she had anything to do with this. But everything she says on the tape inculpates her, and the court can consider the content when it's making the 801 D2E determination. Absolutely, it can consider the content, but there also has to be independent evidence of her involvement, and the court can't just rely on the content. And if you look at... But if we find that independent evidence is sufficient to establish by preponderance of the evidence that she's an unindicted co-conspirator, including consideration of what she says on the phone, isn't that properly admissible under the rules of evidence? If there was sufficient independent evidence, then under 801 D2E, a co-conspirator statement is admissible. But there wasn't... The government hasn't argued that there was. In their briefing, Judge Lasnik, in... Although he didn't cite the rule, in talking about this issue, the only evidence he pointed to was the content of the call. What he said was, based on the content of the call, I find she's an unindicted co-conspirator. I thought... Didn't the court... I thought the court called for a mid-trial memo from the parties on the issue. I don't recall on this issue... But wasn't there argument outside the presence of the jury before the calls were played? I think... Probation officer? I think that has to do with a probation officer issue. Oh, not with regard to the 801 D2E? That's right. Yeah, yeah. Thank you, Your Honor. Counsel, real quick on the context issue. I understand your argument on 801 D2E, but as I understand it, defense counsel did not request a limiting instruction here. Is that right? He didn't. And, you know, the problem with this context argument that the government makes is it's a common refrain by the government that we're not offering it for the truth, it's to show context. But the problem with that is every time you have a defendant in a conversation with somebody else where it's incriminating and recorded, the government could, to relieve the obligation of calling that person, just say, well, we're just offering this for the context. But you get back to the fact that they offered it for the truth. And, Your Honor, you pointed out that there wasn't a limiting instruction. And I think it's in the Valero case that the government cited, there was such a limiting instruction that specifically said, in that case, it was a confidential informant who met with the defendant. And that instruction said, you can't consider the confidential informant's comments for the truth. There was no instruction here. The defendant didn't ask for one, I concede. But the government did argue the truth of misfluentous statements. But then wouldn't we have to evaluate it under a plain error standard in light of all the evidence, all the other evidence that was before the jury? I think this is an abusive, this issue was preserved. And I think that this is an abusive discretion standard. I think, Your Honor. So remind me, when it's argued for the truth, as opposed to context, is there an objection to that? There was no objection in the closing argument when the government made its closing. I would agree that, no, there wasn't. Now, as to the probation officer issue, this was a probation officer who hadn't talked to Mr. Ortiz in over a year. She had never heard him speak Spanish. And the calls she was asked to look at or listen to were all in Spanish. She said that she spoke a little Spanish. It was kind of unclear. She was asked, do you speak Spanish? She said, at all, a little. But she then conceded she didn't understand any of the content of the calls she was asked to listen to. Except for the words that were in English, correct? There were, I think, a dozen calls. And interspersed in all of those calls, there were usually one word or two words in English that were usually one-syllable words like yeah or okay. There were some others. Microwave was one of the longest words. And I thought that he used the phrase all right. The word all right was used. That's true. She said he had a very distinctive voice, correct? She said that, but she said that at trial, after having listened to the calls, before she was asked by the government to listen to the calls, she was never asked to first describe his voice and didn't say, well, you know, he's got a distinctive scratchy voice. This was after she listened to the recording. But she had supervised him for six months or more, had she not? And had met with him on multiple occasions and spoken with him on the phone? She had supervised him for several months, but over a year before she was asked to go back and listen to the calls. But doesn't that all go to weight versus admissibility as to whether she's sufficiently familiar enough with his voice to authenticate it? If we were talking about him speaking English or listening to English calls, I would say yes. The difference here is you've got somebody who, the calls are only in Spanish. And she's never heard him speak. Well, that's not true, counsel. As I read the record, there are some English words that were also intercepted. Very few. And doesn't that bring it then within the Tenth Circuit's decision in United States versus Zepeda-Lopez, which is a case that appears to me to be on all fours? The problem with Zepeda-Lopez, as I recall that case, is that in that case, there was in the call itself, the speaker who was determined to be the defendant used a nickname. He identified himself as Cacho. And the defendant had, in that case, had admitted he was known as Cacho. In these calls, there was no self-identification. The other speaker who ever- You want to save your remaining time? I do. All right. Good morning, Your Honors. May it please the Court. Michael Morgan for the United States. I'll begin with the prison calls issue, although I think I would just point out that if the Court upholds the intercepted calls, I mean, the admission of the prison calls would be, at most, harmless error under any standard. The truly incriminating calls are the intercepted calls. I mean, there is no doubt that, yes, the prison calls definitely put Mr. Ortiz in the conspiracy, but they're such a minor part of the case that I'm, frankly, surprised we're wasting a lot of time arguing about it. But counsel, let me just, just so the record's clear, I thought I read that when the call were made through on the prison call, it would say, this is something Ortiz. It says, this is Anthony Ortiz. Anthony Ortiz, which I don't think there's a dispute that that's the name of this gentleman. No. I mean, he actually gave his prison registration number that was found in his goods. So, I mean, there's no doubt that he is the person on those calls. The only question is, what are you going to do with those calls? Because you're never going to understand what Mr. Ortiz is saying, what his responses mean, if you don't introduce the statements that precipitate the response. Similar to on cross-examination, you know, a lawyer asks a question for, and you get a yes or no answer. That yes or no means nothing if you don't take into account the question. But the question isn't the evidence. Juries are always instructed in that way. So, too, in this context, and that's what this Court's case is about, is that when you have an intercepted call, you have to play both sides of the call, because otherwise, you just can't understand the meaning of the call. Do you think the answer would be different, for example, if he were speaking Japanese or Arabic? Are we talking now about the 901 issue? Yes. No, I don't. I really don't. I don't think it's a function of the language. I think it's a function of the familiarity with the voice. And the rule is actually quite clear. The rule is familiarity with the voice, not the language the voice is speaking, just the voice. And I give the Court an example. Our past two presidents have been fairly bilingual and have addressed the nation in Spanish. And no one would think, if you're so familiar with their English voice, that if you heard a recording of their Spanish voice, that you wouldn't be able to identify that speaker. So, too, here. The probation officer was quite familiar with Mr. Ortiz's voice. And I should actually point out that the record shows that when she identified, played the prison calls, she was also played the English calls. So it wasn't entirely on her recollection of being supervised a year earlier that she was familiar with him. She also heard his English voice the same day that she identifies the—and, again, that's basically a voice exemplar because it's self-identifying—and then she identifies his voice on the prison calls. So that's a perfectly appropriate procedure, regardless of whether the calls are in English or Spanish. And as the Court has pointed out, there were English words, including the phrase, all right, which apparently was sort of a verbal tick that he had. The probation officer testified that his voice is distinctive. And the Court has been provided copies of the English calls. And you can listen to those calls. And I think it's fair to say that his voice is a distinctive one. It's certainly not a Midwestern flat that you might get from a newscaster or something. I mean, you definitely—you listen to those calls. You know who you're talking to. So when you take all that together, it certainly wasn't an abuse of discretion for the district court to say that this is an adequate foundation to—and all the other concerns that counsel raised, they just go to the weight of that identification, which they were free to argue to the jury. If the Court has no further questions on these issues, I will submit on a brief on the rest. All right. Nothing further? Thank you, Your Honor. Thank you. We have some rebuttal time left. I would submit that the admission of the prison calls wasn't harmless. And I think the best way to look at that is, look how much time the government spent in closing argument, talking to the jury about the prison calls. They talked about those before they even get to the wiretap calls. How many wiretap calls did they have with his voice on? There were about 12 wiretap calls that were introduced out of the entire wiretap had several hundred calls. So what do we do with the authentication issue with regard to the prison calls that he identifies himself by name and BOP number? We have not raised an issue saying that that's not him. So there's no question that it's his voice on that, on those two calls. The question is, should Ms. Fuentes' statements have been allowed in? But to take the point that your opposing counsel was making, how can the jury evaluate the admission by the defendant if it doesn't know what the statement by the other party to the conversation was? Well, that's always going to be an issue. And so the government has to make a choice in terms of, how do we get this evidence in? You either prove she's an unindicted co-conspirator by presenting independent evidence that demonstrates that, or you call her. And they did neither in this case. And so that left Judge Lassnick only with the content of the calls to review. And I would simply remind the court that in the course of this trial, there were confidential informants who testified. There was a lot of evidence about drugs and guns, but none of it went to Mr. Ortiz. The only evidence that was really presented against him of any significance were the calls. And the government argued that the prison calls put the wiretap calls in context. Now, I didn't get a chance to address with the court the issue about the suggestiveness of the wiretap calls, and I recognize that that issue wasn't preserved. But I would simply point out that the manner in which the probation officer was asked to identify those calls is clearly suggestive. She's told, she's asked, can you identify Mr. Ortiz's voice on these calls? And she said she assumed he would be on the calls. And I do credit your point about the importance, because at the closing argument, I think the prosecutor said you could convict on her testimony alone. Yes, and that again gets back to, she's told, we're about to go to trial. But remember, this is one week before trial, and defense counsel's told about this apparently at the start of trial. He doesn't have any advance warning, which is why he probably didn't move to suppress prior to trial. But what we have is, so she's told, we want you to try to identify Mr. Ortiz's voice, listen to these calls. She assumes he's going to be on the calls. And then says, yeah, I'm pretty certain that's him, even though I don't speak Spanish, even though I've never heard him speak Spanish, even though I don't understand the content of the calls. Thank you. Thank you, Your Honor. We appreciate your argument, both of you, this morning. United States versus Ortiz is now submitted.
judges: McKeown, Tallman, Owens